UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

DANIEL JEAN-GILLES,

                            Plaintiff,              **OPINION AND ORDER**

            -against-                               20 Civ. 1999 (AEK)

ROCKLAND COUNTY,
EDWIN DAY, *individually*, and
JOSE GUILLERMO ROSA, *individually*,

                            Defendants.
-------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

        Plaintiff Daniel Jean-Gilles brings this action against Defendants Rockland County

("Rockland"), Edwin Day, individually ("Mr. Day"), and Jose Guillermo Rosa, individually

("Mr. Rosa"), asserting claims for gender discrimination pursuant to Title VII (against Rockland)

and 42 U.S.C. § 1983 (against all Defendants) based on the alleged failure to promote Plaintiff to

the position of Commissioner of Human Rights or Acting Commissioner of Human Rights.  *See*

ECF No. 42 ("Second Amended Complaint" or "Second Am. Compl.").  Currently before the

Court is Defendants' motion for summary judgment.  ECF No. 82.  For the reasons that follow,

the motion is GRANTED.

                            **BACKGROUND**

        The facts set forth in this section are undisputed unless otherwise noted, and are taken

from Defendants' Local Civil Rule 56.1 Statement, ECF No. 85 ("Defs.' 56.1"), Plaintiff's

Response to Defendants' Local Civil Rule 56.1 Statement, ECF No. 87 ("Pl.'s Counter 56.1"),

---

        [1] The parties consented to this Court's jurisdiction for all purposes pursuant to 28 U.S.C.
§ 636(c) on October 4, 2021.  ECF No. 54.

Plaintiff's Local Civil Rule 56.1 Statement, ECF No. 88 ("Pl.'s 56.1"), Defendants' Response to

Plaintiff's Local Civil Rule 56.1 Statement, ECF No. 91 ("Defs.' Response 56.1"), and the

supporting materials submitted by the parties.

I.      **Factual Background**

        A.      **Plaintiff's Employment History and the History of the
        Commissioner of Human Rights Position**

        Plaintiff was employed by Rockland from 1992 through his voluntary retirement in

2021.  Pl.' Counter 56.1 ¶ 1; *see* ECF No. 84 ("Riolo Decl.") Ex. B ("Pl.'s Dep.") at 65:12-13.

Plaintiff submitted his resume to Rockland and completed a formal application for the position of

Human Rights Specialist in 1992.  Pl.'s Counter 56.1 ¶ 1.  Plaintiff was interviewed by the then-

Commissioner of Human Rights, Alma Roman, and hired as a Human Rights Specialist on

March 9, 1992.  *Id.* ¶ 2; *see* Pl.'s Dep. at 31:12-16.  As a Human Rights Specialist, Plaintiff's

duties included receiving and investigating discrimination complaints in housing, public

accommodation, employment, and credit, through interviewing witnesses, gathering materials,

writing reports, reviewing documentation, and compiling case files.  Pl.'s Counter 56.1 ¶ 4.

Commissioner Roman stepped down from her post at the end of 1994, after which Joyce Altieri,

a former member of the then-County Executive's office, asked Plaintiff to serve as the Acting

Commissioner of Human Rights.  *Id.* ¶¶ 6-7.  In 1995, the Department of Human Rights

consisted of the Commissioner, a human rights specialist (Plaintiff), a clerk typist, and a human

rights assistant.  Pl.'s Dep. at 32:9-18.  Plaintiff served as Acting Commissioner of Human

Rights from February 1995 through early October 1995.  Pl.'s Counter 56.1 ¶ 8.  During

Plaintiff's time as Acting Commissioner of Human Rights, he continued to fulfill the duties of

Human Rights Specialist as well as those of Acting Commissioner.  *Id.* ¶ 10; Pl.'s Dep. at 33:22-

34:6.  Plaintiff did not communicate to Ms. Altieri that he was interested in being appointed to be

the Commissioner of Human Rights.  Pl.'s Counter 56.1 ¶ 11.  After Plaintiff's tenure as Acting

Commissioner ended, he returned to his position as a Human Rights Specialist and served as the

sole Human Rights Specialist for Rockland from 1992 until August 2, 2021, the date on which he

voluntarily retired.  *Id.* ¶¶ 12, 13, 15; *see* Pl.'s Dep. at 32:19-23.

Cassandra Griffen McIntyre was the next Commissioner of Human Rights; she served in

that role from approximately October 1995 through sometime in 1998.  Pl.'s Counter 56.1 ¶ 16.

After Ms. McIntyre's departure, no one served as the Acting Commissioner of Human Rights;

Ram Nagubandi was appointed as the next Commissioner of Human Rights in 2000.  *Id.* ¶ 17;

*see* Defs.' Response 56.1 ¶ 1.  Mr. Day was elected to serve as the Rockland County Executive

effective January 1, 2014, and continues to hold this position.  Pl.'s Counter 56.1 ¶ 18.  Mr. Rosa

was the Deputy County Executive in Rockland from his appointment on January 1, 2014 until his

retirement in March 2022.  *Id.* ¶ 19.

In 2014, pursuant to an executive order issued by the Rockland County Executive,

oversight of the Human Rights and Community Development departments was combined under

a single commissioner, the Commissioner of Human Rights, with Mr. Nagubandi remaining in

the Commissioner position overseeing both departments.  *Id.* ¶ 20.  In or around April/May 2016,

Mr. Nagubandi stepped down as Commissioner of Human Rights.  *Id.* ¶ 21; *see* ECF No. 89

("Bush Decl.") Ex. 11 ¶ 5 (in a filing submitted to the Equal Employment Opportunity

Commission ("EEOC"), Rockland represented that Mr. Nagubandi served until May 7, 2016).

Mr. Nagubandi told Plaintiff about his departure.  *See* Bush Decl. Ex. 1 ("Pl.'s Aff.") ¶¶ 40-41.[2]

---

[2] Plaintiff asserts that Mr. Nagubandi told him on April 12, 2016 that he was being
suspended, and then told Plaintiff on May 5, 2016 that he was being "pushed out."  Pl.'s Aff. ¶¶
40-41; *see* Pl.'s Dep. at 58:23-59:2.  Thus, by no later than May 5, 2016, Plaintiff had been
notified by Mr. Nagubandi that Mr. Nagubandi would no longer be serving as the Commissioner
of Human Rights.

Rockland did not formally announce Mr. Nagubandi's departure or that the Commissioner of Human Rights position was vacant.  Defs.' Response 56.1 ¶ 5.  Rockland selected Dorothy P. Jennings, Ph.D. to serve as Commissioner of Human Rights, and she began work in that position on May 23, 2016.  Pl.'s Counter 56.1 ¶ 23.  Dr. Jennings left the position several months later— she was not confirmed by the Rockland County Legislature and had to step down as Commissioner.  *Id.* ¶ 24; *see* Defs.' Response 56.1 ¶ 38.  Rockland subsequently named Myrnia Bass-Hargrove to serve as Acting Commissioner of Human Rights, a position she held until July 2017.  Pl.'s Counter 56.1 ¶ 25 (Plaintiff does not contest that Ms. Bass-Hargrove was named Acting Commissioner on January 18, 2017); *but see* Bush Decl. Ex. 11 ¶ 5 (in a filing submitted to the EEOC, Rockland represented that Ms. Bass-Hargrove served as Acting Commissioner beginning in November 2016).  In July 2017, Constance Frazier was appointed Commissioner of Human Rights, and served in that position until March 2022.  Pl.'s Counter 56.1 ¶¶ 26-27.  Spencer Chimbwe was appointed as Commissioner of Human Rights in 2022.  *Id.* ¶ 28.

B.    **Plaintiff's History of Applying for Positions**

The only times Plaintiff submitted formal applications for positions in the Rockland County government were when he was initially hired as a Human Rights Specialist, and when he applied for the Commissioner of Human Rights position after serving as the Acting Commissioner.  *Id.* ¶ 29; *see* Pl.'s Dep. at 39-40.[3]  Prior to Mr. Nagubandi's appointment in

---

[3] Plaintiff testified at his deposition that when he applied for the position of Commissioner of Human Rights around 2000, that was "the only time that I actually formally put a formal application," Pl.'s Dep. at 39:13-25; he then added that the formal application was the submission of his résumé, *id.* at 40:2-8.  When asked whether there was a formal application to submit, Plaintiff responded, "[w]ell, I completed the formal application for my job and I believe I completed the formal application when I was [A]cting [C]ommissioner.  I think those are the only two times that I've actually formally filled out the formal county application."  *Id.* at 40:9-17.

2000, Plaintiff submitted his résumé to Terry Grosselfinger, who was then the Deputy County Executive, for consideration to become the Commissioner of Human Rights.  Pl.'s Counter 56.1 ¶ 32.  At that time, there was no job posting for the position of Commissioner of Human Rights.  *Id.* ¶ 33.  Plaintiff was interviewed, but was not selected for the position in 2000.  *Id.* ¶ 34.

When the Commissioner of Human Rights position became available in 2016 and 2017, Plaintiff did not submit his résumé or express his interest in being considered for the job.  *Id.* ¶¶ 35, 50; Pl.'s Dep. at 59:19-60:15, 62:10-18.  Plaintiff maintains that he did not apply for the position because there was no application process available—Rockland "kept it all secret."  Pl.'s Counter 56.1 ¶ 35; *see* Pl.'s Dep. at 62:10-18.  Plaintiff also never asked anyone about the application process for the role; again, he maintains that he did not ask because there was no application process.  *See* Pl.'s Dep. at 65:5-11 ("Q:  The question is:  Did you ever inquire to find out what the process would be from anyone at the county or from the union?  A:  Again, you presume that there was one.  But, no, there was no such process.  So, no, I did not do that."), 67:14-20 ("Q: . . . I understand that you did testify that you were unaware of what the process was for the application for the [C]ommissioner of [H]uman [R]ights.  But did you ever inquire from the county or the union what the process would be to apply?  A:  No.").[4]

---

[4] Although Plaintiff purports to dispute whether he ever applied for any of the openings for the Commissioner of Human Rights position, his dispute is merely semantic in nature, *i.e.*, that he did not apply because there was no process for doing so.  Such semantic objections do not suffice to create an issue of fact.  *See Arch Specialty Ins. Co. v. TDL Restoration, Inc.*, No. 18-cv-6712 (KMK), 2021 WL 1225447, at *1 n.1 (S.D.N.Y. Mar. 31, 2021) ("Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.") (collecting cases).

C.     **Rockland's Hiring Procedures for the**
       **Commissioner of Human Rights Position**

The Commissioner of Human Rights is classified as a "noncompetitive class policy influencing" position—it is not necessary for candidates to take a civil service exam, and the appointing authority has complete discretion with respect to hiring so long as the candidate meets the minimum qualifications for the position.  Pl.'s Counter 56.1 ¶ 36; *see* Defs.' Response 56.1 ¶ 18.  Joan Silvestri, who served as the Commissioner of Personnel for Rockland from 2012 to 2017, testified at her deposition that with respect to promotions to noncompetitive positions,

> we didn't view them as promotions, they're appointments to noncompetitive posts, that would be up to the individual department to identify candidates.  If they needed help searching for candidates, they would, as an example, if they said, hey, do you have any – people could put applications on file with us, even if we didn't have any openings and we would just have a file full of those and we would kind of look through those first, if there was anybody that would meet the qualifications, if the department head was looking for somebody, we would send that over.  And sometimes we would post it on the County website, if we didn't have any internal candidates or external candidate that we were aware of.

Bush Decl. Ex. 7 ("Silvestri Dep.") at 20:13-21:8.  When discussing the process of looking for a candidate to replace Mr. Nagubandi as Commissioner of Human Rights, Mr. Rosa testified at his deposition that "we" asked the Personnel Office "whether or not there was anybody—they knew of anybody, . . . [and] normally they will advertise and then they will find candidates or not advertise and say, we already have résumés of candidates that would fit that position and here are the résumés."  Bush Decl. Ex. 3 ("Rosa Dep.") at 33:16-34:2; *see id.* at 35:10-14 ("First thing is Personnel Office, we ask the Personnel Office whether or not there was anybody in the County that could fill the job, that is interested in filling the job."); Pl.'s Counter 56.1 ¶ 42.  Mr. Day testified at his deposition that the first step in the process of replacing Mr. Nagubandi "would be that we would contact personnel, ask them to assist us in a search.  We also would very

6

possibly—I'm not sure if this happened, we would do an outreach to county government to our

employees to see if anybody was interested in the position."  Riolo Decl. Ex. C ("Day Dep.") at

33:24-34:8; *see* Pl.'s Counter 56.1 ¶ 42.  Mr. Day added that

> our standard here in Rockland County government is my executive team
> will go through the process with personnel to identify candidates, they will
> receive applications, they will receive résumés.  They will vet the
> candidates who will put theirselves [*sic*] forward as potential candidates.
> And when the process is all finished they would present me with a
> recommendation or recommendations for appointment.

Day Dep. at 34:9-20.  Rockland employees also could contact the Department of Personnel by

phone, email, or in person regarding their interest in any position.  Pl.'s Counter 56.1 ¶ 41.

### D.    The 2016 and 2017 Vacancies and Selections

After Mr. Nagubandi left the Commissioner of Human Rights position in 2016, no job

posting was created for the vacancy.  *Id.* ¶ 49.  Five candidates were considered for the

Commissioner of Human Rights post: Victor Reyes, Gerald H. Inman, Donzella Millighan,

Myrnia Bass-Hargrove, and Dr. Dorothy P. Jennings.  *Id.* ¶ 51.  On May 9, 2016, Mr. Rosa led a

meeting with the combined staffs of the Department of Human Rights and the Department of

Community Development.  *Id.* ¶ 59.  During that meeting, Mr. Rosa generally discussed how the

departments would move forward while a search for a replacement Commissioner of Human

Rights was underway, as well as what support, if any, was needed from the County Executive's

Office during this time.  *Id.* ¶ 60.  According to Plaintiff, Mr. Rosa stated at the meeting that a

female was going to be appointed Commissioner of Human Rights because the last two male

Commissioners of Human Rights "hadn't worked out too well."    Pl.'s Dep. at 210:19-21 ("[H]e

said we're going to hire a woman, the last two guys didn't workout [*sic*] too well."); Pl.'s Aff. ¶

47 ("On Monday, May 9, 2016, there was a meeting with most of the Office of Community

Development personnel and me hosted by Defendant Rosa, the Deputy County Executive.  Rosa

stated that the County was going to hire a woman for the position of Commissioner of Human

Rights, '*because the last two commissioners were men and that hasn't worked out too well.*'")

(emphasis in original).[5]  On May 10, 2016, Mr. Rosa completed the Rockland County Pre-

Appointment Review of Selected Candidate to Fill Vacancy form.  Pl.'s Counter 56.1 ¶ 65.  The

form stated that Dr. Jennings's appointment as Commissioner of Human Rights would begin on

May 23, 2016.  *Id.* ¶ 66.  Dr. Jennings served as the Commissioner of Human Rights until her

appointment was denied by the Rockland County Legislature in the fall of 2016.  *Id.* ¶ 67; *see*

Defs.' Response 56.1 ¶ 38 (Dr. Jennings's last day as Commissioner of Human Rights was

November 21, 2016).

Ms. Bass-Hargrove subsequently was appointed Acting Commissioner of Human Rights,

but she was not considered to fill the position on a permanent basis.  Pl.'s Counter 56.1 ¶¶ 68-69.

Plaintiff was aware that Ms. Bass-Hargrove was only a temporary replacement for Dr. Jennings.

---

[5] Other employees who attended the meeting recalled that Mr. Rosa noted at the meeting
that they were *looking* to appoint a woman, not that a woman had *already* been appointed.  *See*
Bush Decl. Ex. 6 ("Frank Dep.") at 20:25-21:20 ("he said he was looking to appoint a woman
. . . .  The last two men didn't work out so well."); Bush Decl. Ex. 12 (email from Janet
Marsalisi, in which she wrote:  "I remember DCE Rosa saying that they were looking to hire a
woman—the last two commissioners were men and that hasn't worked out too well."); Bush
Decl. Ex. 13 (email from Jessica Sampson, in which she wrote that Mr. Rosa said "maybe" the
new appointee was female and said "he thought a female in the position would be good for the
department and for the office").  But one employee noted that "[i]n a separate discussion that
same day in my office [Mr. Rosa] said it was a woman . . . ."  Bush Decl. Ex. 14 (text messages
from Cinthia Santiago).

Although the text messages and emails corroborate Plaintiff's testimony, a party "cannot
rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that
admissible evidence will be available at trial."  *Messinger v. JPMorgan Chase Bank, N.A.*, 126 F.
Supp. 3d 376, 379 n. 2 (S.D.N.Y. 2015) (quoting *Burlington Coat Factory Warehouse Corp. v.
Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).  Plaintiff has not shown that admissible
evidence as to the statements in these texts and emails will be available at trial.  Accordingly, the
Court does not consider these texts and emails in deciding the motion.  Regardless, viewing the
evidence in the light most favorable to Plaintiff requires the Court to accept Plaintiff's own
recollection of Mr. Rosa's comments at the meeting.

*Id.* ¶ 70.  No job posting was made for the Commissioner of Human Rights position in late 2016 or in 2017.  *Id.* ¶ 71; *see* Defs.' Response 56.1 ¶¶ 48-50.  Rockland considered four candidates to fill the Commissioner of Human Rights position in 2017: Horace Trumbull, Earl Miller, Kenneth Mercer, and Constance Frazier.  Pl.'s Counter 56.1 ¶ 72.[6]  Plaintiff again did not express interest or apply for the Commissioner of Human Rights position.  *Id.* ¶ 73.[7]  Ms. Frazier became Commissioner of Human Rights on July 13, 2017.  Defs.' Response 56.1 ¶ 52; *see* Pl.'s Counter 56.1 ¶ 78.

## II.    Procedural History

Plaintiff filed a complaint with the EEOC on February 21, 2018.  Bush Decl. Ex. 16. Rockland filed a position statement in response on December 13, 2018.  Bush Decl. Ex. 11.  The EEOC issued a determination on May 1, 2019.  Bush Decl. Ex. 17.  Plaintiff commenced this action on March 5, 2020.  ECF No. 1.  An amended complaint was filed on April 17, 2020, ECF

---

[6] In his response to Defendants' Local Civil Rule 56.1 Statement, Plaintiff stated that he "has no independent information to deny or admit" the assertions in this paragraph, as well as several other paragraphs in Defendants' statement.  "[I]f a party responds to a numbered paragraph by stating that [he or] she lacks sufficient information to admit or controvert a particular fact, the fact is deemed admitted."  *Thompson v. Global Contact Servs., LLC*, No. 20-cv-651 (MKB) (SJB), 2021 WL 3486944, at *2 (E.D.N.Y. July 21, 2021), *adopted by* 2021 WL 3476675 (E.D.N.Y. Aug. 6, 2021); *see also Weider Health & Fitness v. AusTex Oil Ltd*., No. 17-cv-2089 (RMB) (OTW), 2018 WL 8579820, at *2 (S.D.N.Y. Dec. 19, 2018) ("a nonmovant cannot raise a material issue of fact by denying statements which the moving party contends are undisputed for lack of knowledge and information in part because discovery allows the party opposing summary judgment to obtain the facts necessary to determine whether it must admit or deny them") (cleaned up), *adopted by* 2019 WL 1324049 (S.D.N.Y. Mar. 25, 2019).

[7] Plaintiff failed to respond at all to paragraph 73 of Defendants' Local Civil Rule 56.1 Statement, which states that Plaintiff "did not express interest or apply for the Commissioner of Human Rights position."  Pl.'s Counter 56.1 ¶ 73.  As a result, the factual assertions in this statement are deemed undisputed.  *See T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56. 1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

No. 3,[8] and the operative Second Amended Complaint was filed on December 7, 2020.[9]

Following the completion of discovery, the Court set a briefing schedule for Defendants' motion

for summary judgment.  *See* Docket Sheet, Minute Entry dated 1/15/2023.  In accordance with

the schedule, Defendants filed their motion papers on March 16, 2023, ECF Nos. 82-85; Plaintiff

filed his opposition papers on April 14, 2023, ECF Nos. 86-89; and Defendants filed their reply

on May 5, 2023, ECF Nos. 90-91.

**DISCUSSION**

**I.     Summary Judgment Legal Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be

granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.

v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine

issue of material fact exists, a court is required to "resolv[e] all record ambiguities and draw[] all

factual inferences in favor of the non-moving party."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135,

145 (2d Cir. 2007); *see also Anderson*, 477 U.S. at 261 n.2; *Mount Vernon Fire Ins. Co. v. Belize*

---

[8] The amended complaint originally was filed on March 5, 2020 (*i.e.*, the same day the original complaint was filed), *see* ECF No. 2, but the March 5, 2020 filing was rejected due to a filing deficiency, and it was subsequently re-filed.

[9] Defendants attach to their motion papers ECF No. 9, the version of the Second Amended Complaint that originally was filed on July 15, 2020, *see* Riolo Decl. Ex. A, but that document was flagged as having a filing deficiency, with instructions to Plaintiff's prior counsel to re-file the pleading.  Plaintiff eventually re-filed the Second Amended Complaint on December 7, 2020, *see* ECF No. 42, and Defendants filed an answer to the re-filed Second Amended Complaint.  *See* ECF No. 43.

*NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001).  A party cannot overcome summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials" cannot "create" genuine disputes of material fact "where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted).  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"  *Anderson*, 477 U.S. at 255; *accord Williams v. N.Y.C. Housing Auth.*, 61 F.4th 55, 76 (2d Cir. 2023).  "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."  *Cruden v. Bank of N.Y.*, 957 F.2d 961, 975 (2d Cir. 1992) (citing *H.L. Hayden Co. v. Siemens Med. Sys. Inc.*, 879 F.2d 1005, 1011 (2d Cir. 1989)).

## II.  Timeliness of Plaintiff's Claims for Alleged Failures to Promote in April, May, and November 2016

Plaintiff contends that Defendants discriminated against him on the basis of his gender by failing to promote him to the position of Commissioner of Human Rights, or Acting Commissioner of Human Rights, at various times in 2016.[10]  As to the 2016 allegations, Defendants maintain that these claims should be dismissed because Plaintiff failed to raise them in time with the EEOC.

---

[10] Although the Second Amended Complaint alleges a failure to promote Plaintiff to the position of Acting Commissioner of Human Rights in April 2016 as well as a failure to promote Plaintiff to the position of Commissioner of Human Rights in May 2016, *see* Am. Compl. ¶¶ 14-18, 29, in his opposition papers, Plaintiff only refers to a failure to promote in May 2016, *see* ECF No. 86 ("Pl.'s Mem.") at 1, 4.  It appears from the record that the only vacancy at issue during these months was in May 2016, when Mr. Nagubandi's tenure ended.  Regardless, any discrepancy on this point is immaterial, as the Court's analysis of the issue of timeliness is the same whether the failure(s) to promote occurred in both April and May 2016 or only in May 2016.

A.      **Title VII Claims against Rockland**

Before a plaintiff may assert employment discrimination claims in federal court pursuant to Title VII, he or she generally must exhaust the administrative remedies provided by the statute. *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). Specifically, "a Title VII plaintiff generally must file a charge of discrimination with the EEOC 'within three hundred days after the alleged unlawful employment practice occurred,' 42 U.S.C. § 2000e-5(e)(1) . . . ." *Id.* [11]; *see also Hurtgam v. Lydonville Cent. Sch.*, 446 F. App'x 385, 386 (2d Cir. 2011) (summary order) (a plaintiff is "required to file a charge of discrimination or retaliation with the [EEOC] within 300 days of the discriminatory or retaliatory act") (cleaned up)). Plaintiff filed his complaint with the EEOC on February 21, 2018, Bush Decl. ¶ 19 & Ex. 16; therefore, only acts of discrimination occurring on or after April 24, 2017, *i.e.*, 300 days before the EEOC filing, are actionable. This would plainly exclude from consideration any alleged failure to promote that took place in 2016, unless an exception applies.

Plaintiff contends that his 2016 claims are not time-barred based on the continuing violation exception to the Title VII statute of limitations. *See* Pl.'s Mem. at 13-16. "Under the continuing violation exception to the Title VII limitations period—a disfavored principle—if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, then all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Flores v. Entergy Nuclear Operations, Inc.*, 313 F. Supp. 3d 511, 524-25 (S.D.N.Y. 2018) (cleaned up),

---

[11] The Second Circuit has noted that "[t]he three-hundred-day look-back period is in fact an extended period that Title VII affords to plaintiffs complaining about conduct that occurred in a state with its own antidiscrimination enforcement mechanisms, which includes New York." *Duplan*, 888 F.3d at 621 n.7.

*aff'd*, 768 F. App'x 139 (2d Cir. 2019).  "[T]he continuing violation exception applies only where a plaintiff alleges an ongoing policy of related discrimination, rather than cases of *discrete* acts of discrimination or retaliation that occur outside the statutory time period, even if other acts of discrimination occurred within the statutory time period."  *Flores*, 768 F. App'x at 140 (cleaned up) (emphasis in original).

Despite Plaintiff's argument to the contrary, failures to promote—even multiple failures over a period of time—are well recognized as discrete acts of discrimination for which the continuing violation exception is inapplicable.  *See Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 157 (2d Cir. 2012) ("an employer's failure to promote is by its very nature a discrete act"); *see id.* ("every failure to promote is a discrete act that potentially gives rise to a freestanding Title VII claim with its own filing deadline").  "Both the employer and the aggrieved party may therefore rely on the clear and predictable statute of limitations when contemplating prospective litigation regarding failures to promote or other discrete acts."  *Id.* Furthermore, the Second Circuit held that discrete acts "which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period."  *Id.*  Plaintiff therefore cannot bring claims regarding the alleged discrete failures to promote in April and/or May and November 2016 within the 300-day limitations period simply by asserting that they were part of a general policy of gender discrimination in the selection of the Commissioner of Human Rights.

To salvage these untimely claims, Plaintiff attempts to rely on the EEOC determination, in which the agency stated that "all statutory requirements for timeliness, deferral and coverage have been met."  *See* Pl.'s Mem. at 15 (citing Bush Decl. Ex. 17).  But "it is for the Court to determine whether Plaintiff's claims are, as a matter of law, timely and within the statute of

limitations." *Wu v. Good Samaritan Hosp. Med. Ctr.*, No. 17-cv-4247 (SJF) (ARL), 2019 WL

2754865, at *3 (E.D.N.Y. July 2, 2019) (cleaned up), *aff'd*, 815 F. App'x 575 (2d Cir. 2020)

(summary order); *see also Pressley v. City of New York*, No. 11-cv-3234 (PKC) (RER), 2015

WL 13730699, at *7 (E.D.N.Y. Aug. 27, 2015) ("The EEOC's timeliness determination is

merely a factor for the Court to weigh[;] courts have generally made an independent review of

the timeliness of the agency filing.  It is, therefore, for the Court to determine whether Plaintiff's

claims are, as a matter of law, timely and within the statute of limitations.  This requires the

Court to determine whether the incidents of employment discrimination are discrete acts.")

(cleaned up), *adopted by* 2016 WL 1271480 (E.D.N.Y. Mar. 31, 2016).[12]

The alleged failures to promote Plaintiff in 2016 constitute discrete acts of gender

discrimination.  Accordingly, because more than 300 days elapsed between each of the alleged

failures to promote in 2016 and Plaintiff's filing of his charge of discrimination with the EEOC

on February 21, 2018, Plaintiff's Title VII claims against Rockland[13] based on the alleged 2016

failures to promote are time-barred.

---

[12] Moreover, to the extent that Plaintiff cites the EEOC determination as relevant to the merits of his discrimination claim, *see* Pl.'s Mem. at 13 ("In addition, the EEOC, after a thorough investigation, found probable cause for sex/gender discrimination . . . ."), "no court has ever held that EEOC proceedings are sufficiently judicial in nature to warrant estoppel.  In fact, the opposite is true, as every court that has considered the issue has found that EEOC determinations have no preclusive effect."  *Mingo v. Niagara Frontier Transp. Auth.*, No. 17-cv-556, 2020 WL 1275455, at *5 (W.D.N.Y. Mar. 17, 2020) (cleaned up) (quoting *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 369 (S.D.N.Y. 2006)).

[13] Although Defendants seek summary judgment on behalf of Mr. Day and Mr. Rosa as to Plaintiff's Title VII claim, *see* ECF No. 83 ("Defs.' Mem.") at 16-17, such relief is not necessary, because the Title VII claim is asserted against Rockland only, *see* Second Am. Compl. ¶ 45.

**B.     Section 1983 Claims Against All Defendants**

Plaintiff also asserts a claim for gender discrimination against all Defendants pursuant to

42 U.S.C. § 1983.  Section 1983 authorizes private suits against any "person who, under color of

any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be

subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws[.]"  42 U.S.C. § 1983.  "Sex-based

discrimination in public employment is actionable under § 1983 as a violation of the Equal

Protection Clause of the Fourteenth Amendment, which protects public employees from various

forms of discrimination . . . on the basis of gender."  *Legg v. Ulster Cnty.*, 979 F.3d 101, 116 (2d

Cir. 2020) (cleaned up).

Section 1983 claims arising out of conduct in New York have a three-year statute of

limitations.  *See Myers v. Doherty*, No. 21-3012-cv, 2022 WL 4477050, at *1 (2d Cir. Sept. 27,

2022) (summary order).  Plaintiff again asserts that his Section 1983 claim based on the alleged

2016 failures to promote is not time-barred because of the continuing violation exception.  *See*

Pl.'s Mem. at 16.  But Section 1983 claims based on failures to promote do not fall within this

exception to the limitations period.  *See Myers*, 2022 WL 4477050, at *1 (continuing violation

exception to Section 1983 three-year statute of limitations "does not apply to discrete acts of

discrimination or retaliation, such as termination, failure to promote, denial of transfer, or refusal

to hire") (quotation marks omitted); *see also Sareen v. Port Auth. of New York & New Jersey*,

No. 12-cv-2823 (PAE), 2013 WL 6588435, at *8 (S.D.N.Y. Dec. 16, 2013) (finding Section

1983 failure to promote claims that were more than three years old were untimely and the

continuing violation doctrine was "inapplicable"), *affirmed sub nom. Sareen v. The Port Auth. of*

*New York & New Jersey*, 592 F. App'x 34 (2d Cir. 2015) (summary order).  Accordingly, since

Plaintiff did not commence this action until March 2020, his Section 1983 claims based on the alleged 2016 failures to promote, all of which took place more than three years before this suit was filed, are time-barred as well.

*     *     *     *     *     *

In sum, Plaintiff's claims of gender discrimination under both Title VII and Section 1983 stemming from alleged failures to promote in 2016 are untimely, and Defendants are entitled to summary judgment on these claims.

### III.   Plaintiff's Claims of Gender Discrimination Based on the July 13, 2017 Alleged Failure to Promote[14]

Plaintiff next claims that Defendants discriminated against him on the basis of his gender by failing to promote him to the position of Commissioner of Human Rights in July 2017, when Constance Frazier was selected for the position.  Defendant maintains that this claim should be dismissed because Plaintiff has not made out a *prima facie* case for discriminatory failure to

---

[14] In his opposition papers Plaintiff refers to an alleged failure to promote in June 2018, *see* Pl.'s Mem. at 2, 3, 7, 11, 12, 13, but Plaintiff did not include any such allegations in his Second Amended Complaint, *see* Second Am. Compl. ¶ 2 ("Daniel Jean-Gilles was also subjected to failures to promote, *the last instance of which occurred on or about July 13, 2017*.") (emphasis added).  "A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."  *LaFontant v. Mid-Hudson Forensic Psychiatric Ctr.*, No. 18-cv-23 (KMK), 2023 WL 6610764, at *19 (S.D.N.Y. Oct. 10, 2023) (quotation marks omitted); *see Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order) ("The district court did not err in disregarding allegations Avillan raised for the first time in response to Potter's summary judgment motion.").  Accordingly, the Court disregards any allegations and arguments regarding a purported failure to promote in June 2018.

promote.  For the reasons detailed below, the Court agrees that Plaintiff has failed to come forward with sufficient evidence to demonstrate that he has satisfied this threshold condition.

### A.    Legal Standard for Discriminatory Failure to Promote

"Title VII makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  *Bart v. Golub Corp.*, -- F.4th ---, No. 23-238, 2024 WL 1281069, at *3 (2d Cir. Mar. 26, 2024) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "At the summary-judgment stage, properly exhausted Title VII claims are ordinarily analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792[] (1973), and its progeny."  *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).  Discrimination claims under Section 1983 are likewise analyzed "under the familiar three-step *McDonnell Douglas* burden-shifting framework."  *Connolly v. City of New York*, No. 20-3125-cv, 2022 WL 843497, at *1 (2d Cir. Mar. 22, 2022) (summary order) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)); *see also Myers*, 2022 WL 4477050, at *1 (analysis of a Section 1983 claim of discrimination in violation of the Fourteenth Amendment's Equal Protection Clause "parallels that of a Title VII claim").  "First, the plaintiff must establish a *prima facie* case of discrimination."  *Connolly*, 2022 WL 843497, at *1.  "Second, if the plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the disparate treatment."  *Id.* (quotation marks omitted).  "Third, if the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination."  *Id.* (cleaned up).

"To establish a *prima facie* case of a discriminatory failure to promote, a Title VII plaintiff must ordinarily demonstrate that: (1) [he or] she is a member of a protected class; (2) [he or] she applied and was qualified for a job for which the employer was seeking applicants; (3) [he or] she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 226 (2d Cir. 2004) (quotation marks omitted); *see Pierre v. City of New York*, No. 17-cv-5782 (JGK), 2020 WL 353538, at *6 (S.D.N.Y. Jan. 21, 2020) (applying same standard for *prima facie* case of discriminatory failure to promote under Section 1983), *aff'd*, 844 F. App'x 411 (2d Cir. 2021) (summary order).

## B.     Applicability of the "Specific Application" Exception

Defendants contend that Plaintiff cannot establish a *prima facie* claim of discriminatory failure to promote primarily because he cannot demonstrate the second element, *i.e.*, that he applied for the Commissioner of Human Rights position when it was open in 2017. *See generally* Defs.' Mem. at 6-12.  Plaintiff counters that he is excused from the specific application requirement because the vacancy for the Commissioner of Human Rights position was never posted; he had no knowledge of the vacancy before it was filled; and he attempted to apply for the position through informal procedures endorsed by Rockland.  Pl.'s Mem. at 11-12.

"[T]he second element of a *prima facie* case [for discriminatory failure to promote] cannot be established merely with evidence that a plaintiff generally requested promotion consideration.  A specific application is required to ensure that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." *Petrosino*, 385 F.3d at 227 (cleaned up).  However, "[t]he law recognizes that the facts of a particular case may sometimes make a specific application a quixotic requirement."

*Id.* (quotation marks omitted).  An employee may therefore "be excused from the specific application requirement," but only if he or she can "demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.* This exception to the specific application requirement "is narrow and does not pertain simply because an employee asserts that an aura of discrimination in the workplace somehow discouraged [him or] her from filing a formal application." *Id.* (quotation marks omitted).

Here, Plaintiff did not submit any application for the position of Commissioner of Human Rights in 2017, and based on the facts and circumstances presented in the record, Plaintiff cannot be excused from the specific application requirement.  There is no dispute that none of the vacancies for the Commissioner of Human Rights position were ever posted in 2016 or 2017. *See* Pl.'s Counter 56.1 ¶¶ 49, 71; Defs.' Response 56.1 ¶¶ 48-50.  But Plaintiff was aware that Ms. Bass-Hargrove, who served as Acting Commissioner of Human Rights from November 2016 through July 2017, was only a temporary replacement for Dr. Jennings, and therefore that there would be a vacancy for the Commissioner position that would have to be filled.  Pl.'s Counter 56.1 ¶ 70; *see* Pl.'s Dep. at 61:5-7 ("Ms. Myrnia Bass-Hargrove came along after and said that she was in charge until they put someone else in."), 221:21-222:6 ("So when Nagubandi left . . . Hargrove came in temporarily . . .  After Ram left, Hargrove was temporary."); *but see* Pl.'s Dep. at 62:24-63:4 (Plaintiff testified that he did not know precisely when Ms. Bass-Hargrove intended to step down from her temporary position).

Further, contrary to his contention, Plaintiff made no attempt to apply for the Commissioner of Human Rights position through informal procedures endorsed by Rockland, even though he had previously made use of such procedures.  While Plaintiff insists that "there

19

was no process to apply for the position of Commissioner of Human Rights," Pl.'s Counter 56.1

¶¶ 30, 31 (emphasis omitted), there is no dispute that Rockland employees could contact the

Department of Personnel at any time by phone, email, or in person regarding their interest in any

position, *id.* ¶ 41.  Indeed, in 1999/2000,[15] even though there was no job posting or formal

application process at that time either, Plaintiff submitted his résumé for the then-available

position of Commissioner of Human Rights.  *Id.* ¶ 33.  Plaintiff similarly characterized the hiring

process in 1999/2000 as "secret" and "undercover"—"[t]hey didn't advertise back then either."

Pl.'s Dep. at 43:13-17.  Yet in his affidavit submitted in opposition to this motion, Plaintiff states

that he applied for the Commissioner of Human Rights position in 1999 by submitting "an

updated résumé to Terry Grosselfinger, via interoffice mail," and that he was then interviewed by

Mr. Grosselfinger.  Pl.'s Aff. ¶¶ 26, 28.  In 2017, however, Plaintiff took no action to express his

interest in the position of Commissioner of Human Rights at any time in prior to the appointment

of Ms. Frazier on July 13, 2017.  *See* Pl.'s Dep. at 62:10-18, 63:10-18.[16]  Instead, Plaintiff

maintains that Rockland should have asked him whether he was interested in the position.  *Id.* at

63:14-15 ("[n]o one from the county executive office sought that information from me.").  But

---

[15] It is unclear from the record whether Plaintiff applied to become the Commissioner of Human Rights in 1999 or 2000.  At his deposition, he testified that he applied in 2000, Pl.'s Dep. at 12-13, but in his affidavit submitted in opposition to this motion, he states that he applied in 1999, Pl.'s Aff. ¶ 27.  This minor discrepancy is not material to the resolution of this motion.

[16] Even though his 2016 failure to promote claims are time-barred, the Court notes that Plaintiff's conduct in connection with the open Commissioner and Acting Commissioner positions at various points in 2016 was similar.  In short, Plaintiff knew of the vacancies, *see* Pl.'s Dep. at 58:23-59:2 (April/May 2016); Pl.'s Aff. ¶ 40 (April 2016) & ¶¶ 65-66 (October/November 2016), but made no effort to apply for either position through the informal procedures with which he was familiar, *see* Pl.'s Dep. at 60:11-15 ("Did I ever express to anyone that I wanted to be commissioner of human rights, in 2016? . . . no."), 63:10-16 ("Q:  Did you ever express interest to anyone from the county executive's office of your interest in being commissioner during or after 2016?  A:  No one from the county executive office sought that information from me.  So, no, I didn't.").

the specific application requirement is intended, in part, to "protect[] employers from the unfair burden of having to keep track of all employees who have generally expressed an interest in promotion and to consider each of them for any opening for which they are qualified but did not specifically apply." *Petrosino*, 385 F.3d at 227 (cleaned up).  In other words, the burden was not on Rockland to assume that Plaintiff would be interested in the Commissioner of Human Rights position in 2017 and seek him out to inquire further about his interest.

And Plaintiff offers no evidence to suggest that there was anything preventing him from submitting his résumé to the Department of Personnel in 2017, when the Commissioner of Human Rights position was once again available.  To the extent Plaintiff maintains that he did not attempt to indicate his interest through Rockland's informal procedures because it would have been futile to do so, that argument is unavailing.  "[A] plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor." *Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1213 (2d Cir. 1993).  "A nonapplicant plaintiff claiming futility bears the 'not always easy burden of proving that [she/]he would have applied for the job had it not been for those [discriminatory] practices.'" *Thelwell v. City of New York*, No. 13-cv-1260 (JGK), 2015 WL 4545881, at *16 (S.D.N.Y. July 28, 2015) (quoting *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 367-68 (1977)), *aff'd*, 733 F. App'x 561 (2d Cir. 2018) (summary order).  Plaintiff relies heavily on Mr. Rosa's comment at the May 9, 2016 meeting—that Rockland was going to hire a woman for the Commissioner of Human Rights position "because the last two commissioners were men and that hasn't worked out too well," Pl.'s Aff. ¶¶ 47-51 (cleaned up)—for the notion that there would have been no point in submitting his résumé for consideration, because Defendants had already committed to hiring a woman as the next Commissioner of Human Rights.  Whatever

merit this assertion might have had for Plaintiff's time-barred claim for an alleged failure to promote in April/May 2016, it has no merit for his 2017 failure to promote claim. More than a year passed since this single comment from Mr. Rosa in connection with the hiring of Dr. Jennings; and when asked whether he expressed his interest in the Commissioner position in 2017, Plaintiff simply reverted back to criticizing the lack of a transparent process, without offering any indication that he took any affirmative steps to advance his own candidacy or that he was deterred from doing so. *See* Pl.'s Dep. at 62:10-18 ("Q:  Prior to Ms. Frazier's appointment, did you apply or express any interest in being the commissioner of human rights? A:  Again your question presumes that there was such a process available.  But, no, there was no process available.  The county kept it all a secret.").  Plaintiff has not demonstrated how Mr. Rosa's 2016 comment stopped him from expressing his interest in the Commissioner of Human Rights position at any point in 2017.  In short, there is no evidence to support an inference that Plaintiff's failure to avail himself of informal procedures to express his interest in the Commissioner of Human Rights position should be excused because it would have been futile for him to have done so.

In what appears to be a *post hoc* rationalization, Plaintiff suggests, in his affidavit in opposition to Defendants' motion, that it was not necessary for him to have taken any steps to indicate his interest in the position in 2017 because he had previously submitted résumés and applications to the Department of Personnel in 1992, 1995, and 1999.  Pl.'s Aff. ¶¶ 55, 69, 76.  Ms. Silvestri, the former Commissioner of Personnel, did testify that when it came to "appointments to noncompetitive posts" (like the Commissioner of Human Rights position), it "would be up to the individual department to identify candidates," further explaining that

> [i]f they needed help searching for candidates, . . . if they said, hey, do you have any – *people could put applications on file with us, even if we didn't*

> *have any openings and we would just have a file full of those and we*
> *would kind of look through those first*, if there was anybody that would
> meet the qualifications, if the department head was looking for somebody,
> we would send that over.

Silvestri Dep. at 20:14-21:4 (emphasis added).  But Plaintiff points to no evidence establishing

either (1) that his résumés and applications that had been submitted over 15 years earlier—for

positions that he both held (Human Rights Specialist, Acting Commissioner of Human Rights)

and applied for (Commissioner of Human Rights)—were kept in the Department of Personnel

file that was maintained for the purpose of filling noncompetitive position vacancies as it existed

in 2017; or (2) that anyone involved in filling the Commissioner of Human Rights vacancy in

2017 would have had any reason to believe that any of Plaintiff's old résumés and applications

were intended to serve as applications to fill that vacancy.  Moreover, Plaintiff states in his

affidavit that he applied for the Commissioner of Human Rights position in 1999 by sending his

résumé directly to then-Deputy County Executive Terry Grosselfinger, Pl.'s Aff. ¶ 26, and there

is no evidence that the Deputy County Executive's office maintained Plaintiff's résumé "on file"

thereafter or at any time during Mr. Rosa's tenure as the Deputy County Executive.

Plaintiff additionally attempts to create an issue of fact by stating in his affidavit that

Rockland "*knew* I was interested in the role of [Commissioner of Human Rights] because I had

been Acting [Commissioner of Human Rights] in 1995, and I had applied for a promotion to

[Commissioner of Human Rights] in 1999."  Pl.'s Aff. ¶ 56 (emphasis in original); *see also id.* ¶¶

70, 77 (same). [17]  But this is simply not enough for Plaintiff to satisfy the specific application

---

[17] Defendants challenge these assertions in Plaintiff's affidavit, invoking the "sham issue
of fact doctrine."  *See* ECF No. 90 (Reply Mem.) at 2-3 & n.5.  "The sham issue of fact doctrine
prohibits a party from defeating summary judgment simply by submitting an affidavit that
contradicts the party's previous sworn testimony."  *Moll v. Telesector Resources Grp., Inc.*, 760
F.3d 198, 205 (2d Cir. 2014) (cleaned up); *see Hayes v. NYC Dep't of Corr.,* 84 F.3d 614, 619
(2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition

requirement for a vacancy for the Commissioner of Human Rights position *in 2017*.  Plaintiff submitted that application and held that position 18 and 22 years earlier, respectively; the people involved in filling the vacancies in 1995 and 1999 were no longer working for Rockland in 2017; and when asked at his deposition if he ever "express[ed] interest to anyone from the county executive's office of [his] interest [*sic*] in being commissioner during or after 2016," Plaintiff responded, "[n]o one from the county executive office sought that information from me.  So, *no, I didn't*."  *Id.* at 63:14-16 (emphasis added).[18]

The flaw in Plaintiff's logic is further highlighted by the fact that he did not testify at his deposition that the résumé and job application he submitted in 1992 functioned as his application to serve, or alerted anyone working for Rockland that he wanted to serve, as the Acting Commissioner of Human Rights in 1995, nor did he testify that either his 1992 or his 1995 résumés/applications functioned as his application to serve, or alerted anyone working for Rockland that he wanted to serve, as the Commissioner of Human Rights in 1999/2000.  Plaintiff likewise did not testify that having served as Acting Commissioner of Human Rights in 1995 alerted anyone working for Rockland of Plaintiff's interest in serving as the Commissioner in 1999/2000.  Rather, as he states in his affidavit, he sent his résumé to Mr. Grosselfinger to apply for the position.

---

to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").  To the extent that the affidavit could be read as contradicting Plaintiff's deposition testimony, the Court rejects any attempt by Plaintiff to use his affidavit to create issues of fact; the only citations to Plaintiff's affidavit in this Opinion and Order are to paragraphs that the Court does not believe represent contradictions of Plaintiff's prior testimony.

[18] This testimony is consistent with Plaintiff's allegations in the Second Amended Complaint that he "was not solicited, consulted or asked about his interest in, or his availability to serve as the Acting Commissioner of Human Rights."  Second Am. Compl. ¶ 17; *see also id.* ¶ 20 (same), ¶ 32 ("neither Plaintiff nor any other males were solicited, recruited, asked about their interests or availability to serve in the position").

* * * * * * * *

In sum, with respect to Plaintiff's sole remaining claim for failure to promote in 2017, Plaintiff was aware of the vacancy for the Commissioner of Human Rights position, and yet did not use any of the informal procedures employed by Rockland to make his interest in the position known.  He did not submit his résumé to Mr. Rosa, the Deputy County Executive (the method that Plaintiff admittedly used to obtain an interview in 1999/2000), nor did he inform anyone in the Department of Personnel or the County Executive's office of his interest.  Because Plaintiff has failed to produce evidence sufficient to demonstrate that his claim falls within the "narrow" exception to the specific application requirement, Plaintiff cannot establish the second element of a *prima facie* claim for discriminatory failure to promote.  Accordingly, Defendants are entitled to summary judgment on this claim under both Title VII and Section 1983.[19]

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (ECF No. 82) is GRANTED, and the case is dismissed with prejudice.

The Clerk of Court is respectfully directed to enter judgment for Defendants and to close the case.

Dated: March 29, 2024
       White Plains, New York

**SO ORDERED.**

_____
ANDREW E. KRAUSE
United States Magistrate Judge

---

[19] Because the Court concludes that Defendants are entitled to summary judgment based on Plaintiff's failure to establish a *prima facie* claim of gender discrimination, it need not address the parties' arguments concerning the personal involvement of Mr. Day or Mr. Rosa, qualified immunity, or municipal liability.